UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA

v.                                    CRIMINAL ACTION NO. 2:08-00105

WILLIAM SAMUEL CHESTER, JR.


## MEMORANDUM OPINION AND ORDER

This case is before the court following the Judgment of the court of appeals entered December 30, 2010.  The issue for consideration is whether defendant William Samuel Chester's conviction for illegal possession of a firearm under 18 U.S.C. § 922(g)(9) works a deprivation of the rights guaranteed him under the Second Amendment.

In essence, the court of appeals has concluded that intermediate scrutiny is the appropriate standard for application in a case such as this and that the government must demonstrate by evidence that there is a reasonable fit between the challenged regulation, 18 U.S.C. 922(g)(9), and a substantial government objective.  United States v. Chester, 628 F.3d 673, 683 (4th Cir. 2010).

On February 4, 2005, defendant was convicted in the Magistrate Court of Kanawha County of the misdemeanor crimes of domestic battery and assault in violation of West Virginia Code section 61-2-28(a) & (b).  The underlying circumstances of those offenses are as follows:

> On April 26, 2004, Chester savagely attacked his 22-year-old daughter, Meghan Chester ("Meghan"). Apparently, their dispute arose over what Meghan had eaten for lunch that day. In this attack, Chester slammed his daughter on the kitchen table. Meghan attempted to leave but Chester followed her, threatened her, and punched her in the face. Meghan fell to the floor in pain, but Chester continued to attack her. He began kicking her as she lay on the ground, and also dumped buckets of water over his daughter's head. After her father "beat her up and assault[ed] her" for some time, J.A. 41, Meghan escaped from her father and locked herself in the bathroom. Eventually, Chester left the residence and Meghan's mother took Meghan to the hospital.

Chester, 628 F.3d at 684 (Davis, J., concurring).

On October 10, 2007, deputies with the Kanawha County Sheriff's Department responded to a 911 call involving another domestic disturbance at defendant's home.  Defendant's spouse at the time, Linda Guerrant, was awakened at 5:00 a.m.  She discovered defendant engaged in a sex act with a prostitute outside the residence.  When Chester noticed his wife, he uttered profanity and dragged her inside the home to the kitchen area.

He then grabbed her face and throat and strangled her while repeatedly shouting "'I'm going to kill you!'" Id. (quoted source omitted).

While defendant's daughter Meghan Chester attempted to distract him, Ms. Guerrant called law enforcement, which arrived soon after. Shortly following their arrival, the responding deputies of the Kanawha County Sheriff's Department found a loaded 12-gauge shotgun in the kitchen pantry. They also located a 9mm pistol in the defendant's bedroom. He concedes ownership of both weapons.

Defendant was indicted for possessing firearms after having been convicted "of a misdemeanor crime of domestic violence" in violation of 18 U.S.C. § 922(g)(9). Defendant moved to dismiss the indictment. He asserted that section 922(g)(9), facially and as applied, violated his Second Amendment right to keep and bear arms. The court denied the motion to dismiss. Defendant subsequently pled guilty on the condition that he be permitted to raise the Second Amendment challenge on appeal.

On February 23, 2010, the court of appeals entered an unpublished decision vacating the Judgment. The United States moved for panel rehearing. The court of appeals granted the United States' motion, vacated its earlier opinion, and

"reissue[d] . . . [its] decision to provide district courts in this Circuit guidance on the framework for deciding Second Amendment challenges." United States v. Chester, 628 F.3d 673, 678 (4th Cir. 2010). On March 8, 2011, the mandate arrived. The parties were directed to submit their respective motions and supporting briefs concerning the matters to be addressed on remand following the Chester decision.

On May 26, 2011, the court conducted an evidentiary hearing. On July 15, 2011, the hearing reconvened, at which time the United States called, inter alia, Ms. Guerrant and Meghan Chester. Meghan Chester testified that, during the April 26, 2004, incident, defendant broke her nose and caused her to suffer a concussion.

Ms. Guerrant's testimony of the abuse she suffered was equally, if not more, disturbing. She noted that defendant menaced her with death threats at least three times and threatened her with a firearm at least twice -- once with a gun in hand and once while he was looking for a gun when the officers intervened during the October 10, 2007, incident. She testified that defendant, prior to the arrival of law enforcement on that occasion, threatened to kill her and ran upstairs in a search for one of his weapons, but was unable to locate it. On another

4

occasion, she testified that defendant's sister visited the home and took a gun from him.

The court thereafter received additional evidence from defendant attached to his August 5, 2011, brief.  The United States followed that submission with an August 12, 2011, filing.

On September 23, 2011, the court of appeals heard oral argument in <u>United States v. Staten</u>, 2:09-0235, a case wherein the undersigned denied the defendant's motion to dismiss an indictment alleging a violation of section 922(g)(9).  The motion to dismiss was based upon Second Amendment grounds.  On December 5, 2011, the court of appeals entered its published decision in <u>Staten</u>.  <u>See</u> <u>United States v. Staten</u>, No. 10-5318, --- F.3d ----, 2011 WL 6016976 (4th Cir. Dec. 5, 2011).  As in this case, the defendant in <u>Staten</u> was found to be in possession in his home of multiple firearms, three to be exact, after having previously been convicted of a misdemeanor crime of domestic violence.

On December 15, 2011, an order was entered in this case noting as follows:

> The court is presently considering the supplementation of the evidentiary record in this action with the empirical evidence garnered from the social science studies and scholarly social science reports ("studies and reports") found in the <u>Staten</u> decision but not within the evidentiary record herein.

(Ord. at 1).  A hearing was scheduled for December 22, 2011.
During the evidentiary hearing, the court received an additional
study and report from the United States, namely, a publication
styled United States Department of Justice, National Institute of
Justice, Patricia Tjaden and Nancy Thoennes, <u>Full Report of the
Prevalence, Incidence, and Consequences of Violence Against Women</u>
(2000), which is now a part of the evidentiary record herein.
The court now deems the matter submitted for decision.

II.

A.    The Governing Standard

The Second Amendment provides that "[a] well regulated
Militia, being necessary to the security of a free State, the
right of the people to keep and bear Arms, shall not be
infringed."  U.S. Const. Amend 2.  In <u>District of Columbia v.
Heller</u>, 554 U.S. 570 (2008), the Supreme Court concluded "that
the Second Amendment conferred an individual right to keep and
bear arms."  <u>Id.</u> at 595.  The majority opinion hastened to add,
however, that "the right was not unlimited, just as the First
Amendment's right of free speech was not . . . ." <u>Id.</u> at 626.

6

While the Supreme Court rejected rational basis analysis as the appropriate means for adjudicating the constitutionality of regulatory restrictions imposed upon the Second Amendment right, it did not otherwise set the measure for judicial review. The court of appeals in Chester has now done so for cases arising in this circuit, and reaffirmed as much in more recent decisions. See United States v. Mahin, No 10-5292, ---- F.3d ----, ----, 2012 WL 336151, at *5 (4th Cir. Feb. 3, 2012) (respecting a Second Amendment challenge to section 922(g)(8), which criminalizes possession of a firearm by one subject to a domestic violence protective order); United States v. Carter, No. 09-5074, ---- F.3d ----, ----, 2012 WL 207067, at *3 (4th Cir. Jan. 23, 2012) (respecting a Second Amendment challenge to section 922(g)(3), which criminalizes possession of a firearm by one who is an unlawful user of, or addicted to, any controlled substance); United States v. Staten, No. 10-5318, --- F.3d ---, ---, 2011 WL 6016976, at *3 (4th Cir. Dec. 5, 2011) (respecting a Second Amendment challenge to section 922(g)(9), which criminalizes possession of a firearm by one previously convicted of a misdemeanor crime of domestic violence); United States v. Chapman, No. 10-5071, --- F.3d ---, ---, 2012 WL 11235, at *4 (4th Cir. Jan. 4, 2012) (respecting a Second Amendment challenge

to section 922(g)(8), which criminalizes possession of a firearm

by one subject to a domestic violence protective order).

The <u>Chester</u> decision prescribed "a two-part approach to

Second Amendment claims" under <u>Heller</u>:

> The first question is "whether the challenged law
> imposes a burden on conduct falling within the scope of
> the Second Amendment's guarantee." This historical
> inquiry seeks to determine whether the conduct at issue
> was understood to be within the scope of the right at
> the time of ratification. If it was not, then the
> challenged law is valid. If the challenged regulation
> burdens conduct that was within the scope of the Second
> Amendment as historically understood, then we move to
> the second step of applying an appropriate form of
> means-end scrutiny. <u>Heller</u> left open the issue of the
> standard of review, rejecting only rational-basis
> review. Accordingly, unless the conduct at issue is
> not protected by the Second Amendment at all, the
> Government bears the burden of justifying the
> constitutional validity of the law.

<u>Chester</u>, 628 F.3d at 680 (citations omitted); <u>United States  v.

Carter</u>, No. 09-5074, 2012 WL 207067, at *3 (4th Cir. Jan. 23,

2012) (noting the <u>Chester</u> "two-step approach for evaluating a

statute under the Second Amendment.").

Based upon the United States' position on appeal, along

with the inconclusive historical record concerning the

dispossession of misdemeanants, the panel found favorably for

defendant on the first prong: "We must assume . . . that

Chester's Second Amendment rights are intact and that he is

entitled to <u>some measure</u> of Second Amendment protection to keep

and possess firearms in his home for self-defense."  Id. at 681
(emphasis added); see Carter, 2012 WL 207067, at *4 ("But Carter
cannot claim to be a law-abiding citizen, and therefore his
asserted Second Amendment right cannot be a core right, as we
held in Chester, where we concluded that the defendant's status
as a domestic violence misdemeanant rendered his claim 'not
within the core right identified in Heller.'" (quoting Chester,
628 F.3d at 682-83).

        The panel next turned to the far-more complex and
contentious second prong, about which Heller did not elaborate.
As the panel observed, "Heller left open the level of scrutiny
applicable to review a law that burdens conduct protected under
the Second Amendment, other than to indicate that rational-basis
review would not apply in this context."  Id. at 682; see also
id. at 688-89 (Davis, J., concurring) ("Heller has left in its
wake a morass of conflicting lower court opinions regarding the
proper analysis to apply to challenged firearms regulations.").

        For individuals like defendant, who are "not within the
core right identified in Heller," the panel settled on the
following formulation of means-ends analysis: "[T]he government
must demonstrate under the intermediate scrutiny standard that

there is a 'reasonable fit' between the challenged regulation and a 'substantial' government objective." Id. at 683.

After observing that "the government ha[d not, in the record,] carried its burden of establishing a reasonable fit between the important object of reducing domestic gun violence and § 922(g)(9)'s permanent disarmament of all domestic-violence misdemeanants," the case was remanded to afford the United States the "opportunity to shoulder its burden and Chester an opportunity to respond." Id. at 683; Carter, 2012 WL 207067, at *6 ("To discharge its burden of establishing a reasonable fit between the important goal of reducing gun violence and the prohibition in § 922(g)(3), the government may not rely upon mere 'anecdote and supposition.'") (quoting United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 822 (2000)).

In Carter, the panel observed that there is no precise formula the United States need follow in making the required showing:

> Thus, while the government must carry its burden to establish the fit between a regulation and a governmental interest, it may resort to a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense, as circumstances and context require.

Carter, 2012 WL 207067, at *6. As more fully set forth infra, the United States relies principally upon empirical evidence.

B.      The Parties' Contentions

        The United States asserts generally that section
922(g)(9) is substantially related, and reasonably fitted, to the
important governmental objective of decreasing firearm use in
domestic violence incidents.  First, it contends that the
available empirical evidence shows that firearm use is often a
factor in domestic disturbances.  (See, e.g., U.S. Br. in Supp.
at 11 ("In 2005 alone, 678 women and 147 men were shot and killed
by intimate partners in the United States.") (citing Bureau of
Justice Statistics, James Alan Fox & Marianne W. Zawitz, Homicide
Trends in the United States (2007)).[1]  There is also evidence
that firearm use makes such events more dangerous.  See, e.g.,
Douglas J. Wiebe, Homicide and Suicide Risks Associated with
Firearms in the Home: A National Case-Control Study, 41 Annals of

_____

        [1]The court, after alerting the parties and providing an
opportunity to be heard, has taken judicial notice of the en-
tirety of the current version of the Fox and Zawitz study.
Bureau of Justice Statistics, James Alan Fox & Marianne W.
Zawitz, Homicide Trends in the United States (2011), available
at, http://bjs.ojp. usdoj.gov/content/homicide/homtrnd.cfm.  The
analysis examines, inter alia, certain factors relating to all
homicides committed between 1976 and 2005.  Spouses and family
members accounted for 15% of all victims.  The authors also
examined the homicide rates for "intimates," which included
spouses, ex-spouses, boyfriends, girlfriends, and same-sex
relationships.  In 1996, the year of the Lautenberg amendment,
the number of gun homicides accounted for 61% of total homicides
in the intimates category.

Emergency Medicine 771 (2003) ("Among the adults studied here, the relative risk to be shot fatally (homicide) was significantly higher among women than men.  This likely reflects the singular danger faced by women in abusive relationships.").

Second, the United States notes a level of enhanced recidivism among perpetrators of domestic violence, namely, the later homicide of one suffering an earlier event of physical violence in the home.  It asserts this phenomena also supports Congress' categorical restriction of firearm privileges.  (See, e.g., U.S. Br. in Supp. at 10-11 ("'[L]iving in a household where someone had previously been hit or hurt in a fight in the home [is] . . . strongly and independently associated with homicide . . . .'") (quoting Arthur L. Kellermann, Gun Ownership as a Risk Factor for Homicide in the Home, 329 The New England Journal of Medicine 1084 (1993)); see also Scott L. Feld & Murray A. Straus, Escalation and Desistance of Wife Assault in Marriage, 27 Crimin. 141 (Feb. 1989) ("[E]ven though the bulk of the assaults that occur in marriage are minor, they could continue indefinitely and escalate into more severe assaults.  A number of studies report such a pattern.") (citing studies).[2]

_____

[2]Defendant criticizes some of the studies relied upon by the United States, principally the Kellerman piece.  He asserts that the Kellerman article was neither peer reviewed nor its raw data made available for inspection to interested parties.  While the
(continued...)

Third, it suggests that firearms in the home, and during confrontational interactions between intimates, aggravate the effects of domestic violence.  (See, e.g., Linda E. Saltzman et al., Weapon Involvement and Injury Outcomes in Family and Intimate Assaults, 267 J. of the Am. Med. Ass'n 3043, 3045 (1992) ("We found clear evidence that firearm associated [family and intimate assaults ("FIAs")] are much more likely to result in death than non-firearm-associated FIAs.") (cited in U.S. Br. in Supp. at 12); Office of Justice Programs, Jacquelyn C. Campbell et al., Assessing Risk Factors for Intimate Partner Homicide, 250 NIJ J. 16 (2003) ("When a gun was in the house, an abused woman was 6 times more likely than other abused women to be killed.")[3];

_____

[2](...continued)
court has not relied upon that study in any significant way, other courts have.  See, e.g., Staten, 2011 WL 6016976, at *10; United States v. Booker, 644 F.3d 12, 26 (1st Cir. 2011); United States v. Reese, 627 F.3d 792, 803 (10th Cir. 2010); United States v. Skoien, 614 F.3d 638, 643-44 (7th Cir. 2010) (en banc). Judge Davis also cited the study in his concurring opinion in this case.  Chester, 628 F.3d at 692 n.6 (Davis, J. concurring).

[3]Defendant notes another study authored by Dr. Campbell the same year.  Data found in that other study suggested that a domestic abuser's prior use of a gun, in the worst incident of abuse he committed, resulted in a 41-fold increase in the risk of femicide.  The author suggested this stark increase  "apparently" mediated the effects of an abuser's access to a gun, making it no longer apparently statistically significant.  Defendant does not disclose the link between the July 2003 study by Dr. Campbell that he cites and the November 2003 study by her cited herein.
He concedes as well that the study he relies upon examined only femicide, not other unlawful uses of a firearm, such as when
(continued...)

13

Susan B. Sorenson, <u>Firearm Use in Intimate Partner Violence</u>, 30 Eval. Rev. 229, 232-33 (Jun. 2006) ("[I]f a firearm is used in an intimate partner homicide, it is likely to be used to kill a woman. . . . Woman are more than twice as likely to be shot by their male intimates as they are to be shot, stabbed, strangled, bludgeoned, or killed in any other way by a stranger . . . . In addition . . . . the most recent data available indicate that as homicides of women by strangers have decreased, the number of homicides by intimates with handguns has increased.").

Fourth, it notes disturbing officer-safety conse-quences. Between 2000 and 2009, nearly 8% of non-accidental law enforcement officer fatalities in the line of duty were related to domestic disturbance calls. Federal Bureau of Investigation, <u>Law Enforcement Officers Killed and Assaulted 2009</u> Table 19 (2010).

---

[3](...continued)
it is used in aid of a domestic assault. This concession is significant. <u>Compare</u> Susan B. Sorenson & Douglas J. Wiebe, <u>Weapons in the Lives of Battered Women</u>, 94 Am. J. Pub. Health 1412, 1414 (2004) ("If a gun was kept in the home, the respondent was asked whether she and her partner had used the gun(s) against each other. Nearly two thirds (64.5%) responded that the partner had used one of the guns <u>to scare, threaten, or harm her</u>.") (emphasis added), <u>with</u> <u>Staten</u>, 2011 WL 6016976, at *6 (casting the governmental objective as including the purpose of disarming persons convicted of threatening use of a deadly weapon against a spouse, former spouse, or other person with whom such person had a domestic relationship).

Defendant asserts that predictions about future dangerousness, such as those associated with domestic violence misdemeanants who may use a weapon against their partner in the future, are fraught with peril.  He also emphasizes that he did not use a firearm during either of the domestic violence incidents described earlier.  He contends that it is thus constitutionally impermissible to ban him for life from possessing firearms.[4]  In particular, defendant asserts that the "the total ban on . . . [his] possession of a firearm in his home for defense of self and family is substantially broader than necessary to achieve the federal government's Constitutionally authorized interest."  (Def.'s Br. in Supp. at 9).  Defendant reasons that the statute may not permissibly include within it those domestic violence misdemeanants who have used a gun previously during a domestic assault with those who have not,

---

[4]Defendant presents some arguments that are beyond the scope of the mandate, which essentially directed the court to develop the evidentiary record and conduct the appropriate means-ends analysis.  For example, he appears to assert that his right to possess firearms survived his misdemeanor violence conviction. The decision in Chester observes as much, at least insofar as home-based self defense is concerned.  As noted, however, that conviction diminished the vitality of defendant's Second Amend-ment privilege, moving him away from the protection found at the core of the provision for those "law-abiding, responsible citizen[s who wish] to possess and carry a weapon for self-defense."  Chester, 628 F.3d at 683.  Defendant also appears to lodge a challenge to Congress' authority to enact section 922(g)(9) consistent with United States v. Lopez, 559 U.S. 549, 559 (1995).  The court does not have occasion to reach the contention.

inasmuch as to do so would deprive a substantial number of domestic violence misdemeanants of their constitutionally protected right of armed self defense in the home.

Defendant notes that no study cited by the United States has "found that a person, like Mr. Chester, who had a misdemeanor domestic violence conviction, but who ha[s] not used a firearm or any other weapon during the domestic violence, was more likely to unlawfully use a firearm than a person in the general population."  (<u>Id.</u> at 11).[5]

_____

[5]Defendant also contends that in addition to the as-applied challenge he asserts on his own behalf, he is entitled to lodge a general overbreadth challenge for the benefit of others burdened by the application of section 922(g)(9).  Recent controlling precedent is otherwise.  <u>See</u>, <u>e.g.</u>, <u>United States v. Masciandaro</u>, 638 F.3d 458, 460 (4th Cir. 2011) (noting as follows in the context of a Second Amendment challenge: "Although Masciandaro has also mounted a separate facial challenge to § 2.4(b), we conclude that this challenge is foreclosed by our determination that the regulation is constitutional on an as-applied basis.").
    In asserting his right to nevertheless assert his overbreadth challenge, defendant relies upon <u>Board of Trustees v. Fox</u>, 492 U.S. 469 (1989).  While the decision in <u>Masciandaro</u> cited <u>Fox</u>, it nevertheless deemed the overbreadth challenge to be foreclosed.  It is noteworthy as well that the decision in <u>Masciandaro</u> did not pass on the circumstances, if any, under which an overbreadth challenge may be made in a Second Amendment challenge, noting "the novel notion that . . . [such a] challenge could be recognized 'outside the limited context of the First Amendment . . . .'"  <u>Masciandaro</u>, 638 F.3d at 474 (citation omitted).
    In any event, a facial challenge would be unsuccessful.  The evidentiary record discloses that the risks of mixing domestic violence misdemeanants with weapons in the home will result in tragic consequences in some cases.  That is a threat, as more fully explained <u>infra</u>, that Congress was entitled to address
(continued...)

C.    Analysis

          Section 922(g)(9) was enacted in 1996 as a portion of
the Lautenberg Amendment to the Gun Control Act of 1968.
Congress there implemented a substantial governmental objective
by attempting to remove a form of deadly force from the arsenal
of one previously adjudicated to have physically abused a
domestic partner.  See United States v. Salerno, 481 U.S. 739,
749 (1987); see also United States v. Hayes, 129 S. Ct. 1079,
1087 (2009) ("Construing § 922(g)(9) to exclude the domestic
abuser convicted under a generic use-of-force statute (one that
does not designate a domestic relationship as an element of the
offense) would frustrate Congress' manifest purpose. Firearms and
domestic strife are a potentially deadly combination
nationwide."); United States v. Skoien, 614 F.3d 638, 642 (7th
Cir. 2010) (en banc) ("[N]o one doubts that the goal of §
922(g)(9), preventing armed mayhem, is an important governmental
objective."); cf. Carey v. Brown, 447 U.S. 455, 471  (1980) ("The
State's interest in protecting the well-being, tranquility, and

     ⁵(...continued)
respecting, at a minimum, the most violent and recidivist of
offenders.  See United States v. Moore, No. 10-4474, ---- F.3d
----, ----, 2012 WL 208041, at *3 (4th Cir. Jan. 25, 2012)
("Under the well recognized standard for assessing a facial
challenge to the constitutionality of a statute, the Supreme
Court has long declared that a statute cannot be held unconstitu-
tional if it has constitutional application.").

                              17

privacy of the home is certainly of the highest order in a free and civilized society.").

Indeed, at least one federal appellate court, the First Circuit in Booker, noted at some length the record before Congress at the time of the Lautenberg Amendment and the harms sought to be remedied thereby:

> With its enactment of the Lautenberg Amendment, Congress recognized a problem of significant national concern in the combination of domestic violence and guns, and saw the existing law as insufficiently protective of its victims. See, e.g., 142 Cong. Rec. S8831 (daily ed. July 25, 1996) (statement of Sen. Lautenberg) (noting national statistics reporting 150,000 domestic violence incidents involving a gun each year). . . . Congress concluded that the focus on felony convictions left guns in the hands of a large number of domestic abusers who were convicted of lesser crimes, often due to some combination of plea bargaining, "[o]utdated or ineffective laws [that] treat domestic violence as a lesser offense," and lack of cooperation from victims. 142 Cong. Rec. S10379 (daily ed. Sept. 12, 1996) (statement of Sen. Feinstein). Through the Lautenberg Amendment, Congress sought to "close this dangerous loophole," id., and "establish[] a policy of zero tolerance when it comes to guns and domestic violence," 142 Cong. Rec. S8831 (daily ed. July 25, 1996) (statement of Sen. Lautenberg).

Booker, 644 F.3d at 16; cf. also Chapman, 2012 WL 11235, at *4 (noting that the legislative history of section 922(g)(8) "is fully consistent with" the substantial governmental objective of reducing domestic gun violence)(citing Tom Lininger, A Better Way to Disarm Batterers, 54 Hastings L.J. 525, 538-44 (2003)).

18

Defendant does not seriously quarrel with the point. The battle lines are instead drawn around the fit between section 922(g)(9) and the objective it sought to achieve, namely, decreasing firearm use during domestic violence incidents.  The studies identified heretofore point to, _inter alia_, (1) the risk of death to law-enforcement officers when responding to a domestic incident, (2) firearm use accompanying domestic disturbances, thus making the events more dangerous, and (3) clear evidence that firearm-associated family and intimate assaults are much more likely to result in death than non-firearm associated events of the same type.

Supportive of the last two observations is Judge Davis' apt recognition in his separate opinion in _Chester_ that "sound research of unquestionable reliability (much of it empirical) indicates that the presence of firearms greatly increases the risk of death for women suffering from domestic abuse."  _Chester_, 628 F.3d at 692 (Davis, J., concurring) ("I can foresee no difficulty for the district court in sustaining the constitutional validity of the application of § 922(g)(9) in this case.").  A similar view was espoused by the panel in _Staten_. _See_ _Staten_, 2011 WL 6016976, at *11 (noting "the use of firearms in

connection with domestic violence increases the risk of injury or homicide during a domestic violence incident . . . .").

Support for the view is also found in both the recent Booker decision and the earlier en banc opinion in Skoien:

> It follows that removing guns from the home will materially alleviate the danger of intimate homicide by convicted abusers. And, as the Seventh Circuit [in Skoien] has noted, the fact that the recidivism rate for domestic violence is high suggests that there are "substantial benefits in keeping the most deadly weapons out of the hands of domestic abusers." Id. at 644 (surveying studies estimating overall domestic violence recidivism rate to be between 35% and 80%).

United States v. Booker, 644 F.3d 12, 26 (1st Cir. 2011). All of these observations together indicate that decisive action was required of Congress, even if it painted with a brush broader than it might have had Heller been handed down sometime prior to the Lautenberg amendment.

As noted by the court of appeals in Staten, "the net cast by § 922(g)(9) may be somewhat over-inclusive." Staten, 2011 WL 6016976, at *11.[6] From the defendant's viewpoint of the

---

[6]The court of appeals is well aware of the overarching reach of section 922(g)(9), as explained recently in Carter:

> Section 922(g)(9) permanently disarms anyone convicted of a misdemeanor crime of domestic violence, even if the defendant has only one remote conviction. Although we ultimately upheld § 922(g)(9) as constitutional in Staten, Chester understandably required the government
> (continued...)

20

evidence, he has not heretofore used a firearm during a domestic
incident, but section 922(g)(9) nevertheless operates to ban him
from gun possession in the future.  One consequence of his
knowing and voluntary violation of state law, however, is that he
no longer can claim the benefits of the core protections enjoyed
by law-abiding citizens.  Having moved outside that nucleus into
a category occupied by those convicted of violent misdemeanors,
he is now subject to a lesser protection from governmental
interference with his gun-possession rights.

        The lesser Second Amendment protection enjoyed by
defendant includes being swept up with others in a reasonably
tailored ban on firearm possession in order to achieve a weighty
objective.  In sum, at least as far as concerns defendant and
those similarly situated, Congress is not obliged to legislate
with perfect precision when seeking to advance its worthy
interests at the expense of diminished gun-possession rights for
those who knowingly, and violently, transgress the law.[7]

_____

[6](...continued)
to make a heightened evidentiary showing before uphold-
ing the measure.

Carter, 2012 WL 207067, at *6.

    [7]Defendant's assertion is also in tension with recent extra-
circuit precedent.  Only one of the two defendants in Booker used
a firearm during his predicate misdemeanor crime of violence.
                                                    (continued...)

<u>Chapman</u>, 2012 WL 11235, at *8 (noting with respect to section 922(g)(8) that although "the fit is not a perfect one; a reasonable fit is all that is required under intermediate scrutiny.").

It is also the case that the section 922(g)((9) prohibition might be seen as a lifetime ban.  For example, there is no requirement of an individualized future risk assessment to support an ongoing ban on gun possession.  As this court has previously recognized, however:

> Congress added provisions indicative of tailoring.  The phrase "[m]isdemeanor crime of domestic violence" limits section 922(g)(9) to those offenders who actually used or attempted to use physical force or threatened the use of a deadly weapon in a domestic disturbance.

<u>United States v. Staten</u>, 2010 WL 3476110, at *6 (S.D. W. Va. Sept. 2, 2010); <u>see</u> <u>also</u> <u>Staten</u>, 2011 WL 6016976, at *6 (discussing the narrowing measures and safeguards taken by Congress in drafting the statute including the fact that "a 'misdemeanor crime of domestic violence,' for purposes of a § 922(g)(9) offense, is one in which the use or attempted use of force capable of causing physical pain or injury to another or

---

[7](...continued)
The United States Court of Appeals for the First Circuit never-theless treated both defendants the same.  Neither was deemed to have suffered a constitutional deprivation when convicted under section 922(g)(9).

the threatened use of a deadly weapon is an element of the offense.").

As reflected in both the Skoien and Booker decisions, this violence requirement is of some moment:

> [I]n covering only those with a record of violent crime, § 922(g)(9) is arguably more consistent with the historical regulation of firearms than § 922(g)(1), which extends to violent and nonviolent offenders alike. See C. Kevin Marshall, Why Can't Martha Stewart Have a Gun?, 32 Harv. J.L. & Pub. Pol'y 695, 698 (2009) ("[A]ctual 'longstanding' precedent in America and pre-Founding England suggests that a firearms disability can be consistent with the Second Amendment to the extent that . . . its basis credibly indicates a present danger that one will misuse arms against others and the disability redresses that danger."). As Skoien notes, this extension of the felon firearm ban to non-violent offenders renders it "difficult to condemn § 922(g)(9), which like the . . . [Federal Firearms Act of 1938] is limited to violent crimes." 614 F.3d at 641.

Booker, 644 F.3d at 23 n.13. Additionally, and however unlikely to succeed, defendant might also seek expunction or a pardon.

Based upon the foregoing discussion, the United States has demonstrated that there is a reasonable fit between the statute and the substantial governmental objective at stake. Indeed, the circuits to consider the issue have uniformly concluded that section 922(g)(9) is constitutional as applied to one such as the defendant. See Staten, 2011 WL 6016976, at *11 ("In accord with the unanimous view of our sister circuits who

have addressed the issue, we have no trouble concluding the fit here is, at least, reasonable."); <u>Booker</u>, 644 F.3d at 26 (upholding § 922(g)(9) against an as-applied Second Amendment challenge); <u>Skoien</u>, 614 F.3d at 642 (en banc) (same); <u>see also</u> <u>Mahin</u>, 2012 WL 336151, at *4 (citing cases and noting the appellant in <u>Mahin</u> offered "his Second Amendment challenge in the face of mounting case law declining to overturn on Second Amendment grounds criminal convictions [generally] under 18 U.S.C. § 922(g).").

The court, accordingly, concludes that section 922(g)(9) is constitutional as applied to defendant.[8]

The Clerk is directed to forward copies of this written opinion and order to the defendant, all counsel of record, the United States Probation Department, and the United States Marshal.

DATED: February 10, 2012

John T. Copenhaver, Jr.
United States District Judge

---

[8]The court has this date resentenced defendant to a term of five months imprisonment and three years of supervised release, with five months of home confinement. That is the same sentence originally imposed. Pending appeal of his conviction and sentence, the defendant chose to serve the five-month term of imprisonment and commence service of the three-year term of supervised release, completing the five months of home confinement.